STONE, Administratrix, Respondent, vs. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY, Appellant.

*May 4 — May 25, 1894.*

(1) *Railroads: Ejection of would-be passenger from freight train.*
(2) *Evidence: Physicians and surgeons: Statements of patient.*
(3) *Punitory damages: Error, when cured.*

1. The conductor of a freight train prohibited from carrying passengers was acting within the scope of his authority in compelling a would-be passenger to leave the train, and the railway company is liable for injuries to the latter caused by his ejection while the train was in motion so that it was dangerous for him to get off.

2. In an action for personal injuries, a physician who had before been treating the plaintiff, and who was consulted by him on the day after the accident for the purpose of obtaining treatment, may testify to symptoms then existing, although he cannot distinguish between what he himself observed and what the plaintiff told him, and it appears that the plaintiff already contemplated suit.

3. An error in allowing the jury to find punitory damages is cured where the compensatory and punitory damages are assessed separately and the latter are afterwards disallowed by the court.

APPEAL from the Circuit Court for *St. Croix* County.

This action was brought by the plaintiff's intestate, Jefferson Stone, for the recovery of damages for being unlawfully, forcibly, and violently ejected from a train of cars of the defendant, whereby he was pitched forward onto the ground, injuring his left side and foot and injuring him internally, and while the train was moving at an alleged rapid rate of speed. The train in question was a through freight train, prohibited by orders from carrying passengers. The intestate boarded said train at North Wisconsin Junction, to go to the city of New Richmond. The answer was, in substance, a general denial.

Considerable testimony was given for the purpose of showing that the train in question frequently carried passengers, and that Stone was encouraged to attempt passage thereon by the acts, declarations, and conduct of certain employees of defendant, but who were not connected with and had no control or management of the train. Various exceptions arose in regard to this branch of the case, but, for the purposes of the decision, it may be assumed that plaintiff's intestate did not become a passenger or acquire the rights of such on the train in question.

The testimony on the part of the plaintiff was to the effect that after the train had started from North Wisconsin Junction, and proceeded half or three quarters of a mile, the conductor came into the caboose where the plaintiff was, and asked him where he was going, to which he replied "To New Richmond." The conductor responded: "No, sir; not on this train. You can't go on this train, and I want you to get off, and get off now, too." That plaintiff's intestate stated he could not get off then, the way that the train was running; that if he slacked it up, so he could get off, he would do so without any trouble. The conductor said, "You can get off, and I want you to get off, and right off, too;" and kept urging him towards

Stone vs. Chicago, St. Paul, Minneapolis & Omaha R. Co.

the door, and out onto the platform. That he tried to talk to the conductor, but he would not let him and was bound he should get off. So he went out on the right-hand side of the car behind, got down on the steps, and the conductor says, "Come, jump;" and, as he said that, the intestate jumped off into the ditch on the side. That one of his feet struck a rock or something hard, and it cramped him down on his side, so that he caught with his left hand to keep from falling. That it hurt his stomach and chest. That he felt a sharp pain in his stomach and left side, and hurt his ankle, too. That the train was going pretty fast. That they were then about a mile from the junction. There was testimony tending to show that the train was going at the rate of from six to eight miles an hour. That the conductor seemed "to be real fierce and ugly and mad because I was on there, for some reason or other." That intestate walked back to the junction, went to New Richmond on the same day, and thence home. That he felt pretty lame and sore. His stomach pained him considerably, and, after he had been to bed an hour or two, felt pretty bad; pain in the stomach, sick, got up and vomited, and went back to bed again; pained him all night, and in the morning was about the same; could not retain his breakfast, and that morning went to New Richmond to see Dr. Wade.

Other testimony was given as to the character and extent of his injuries. Dr. Wade, a practicing physician, testified to having treated the plaintiff's intestate for stomach trouble about a month or more before the accident, during which time he had improved. Objection was made to his stating his condition at the time; that his testimony on the subject was incompetent, the doctor having stated that it was hard for him to distinguish between the objective symptoms, or those ascertained by his personal examination, and the subjective ones, communicated by the statements of his patient. He said that his objective symptoms

were marked tenderness in the region of the stomach. The court allowed the witness to state, against the defendant's objection, what the plaintiff's intestate complained of at that time; and he testified that he had great tenderness in the pit of the stomach and pain upon pressure, extending through it and underneath the left shoulder blade. He had been vomiting frequently through the night, and had general symptoms of indigestion, acute gastric inflammation, uneasiness in the stomach, and was disabled at that time for work. He stated that many causes might produce that condition, as a blow, a wrench, or strain; that his condition might have been the result of a sudden jerk or wrench. The court ruled that the patient's statements to the doctor, made since the action was commenced, could not be received in evidence, but admitted his previous declarations to him as to his symptoms. Dr. Wade further testified that the condition grew into one of chronic gastritis of the stomach, and there had been a slight enlargement of it, and a tenderness more or less marked. "Leaving out Mr. Stone's statements to me, I could see a change in his condition between the 21st of September and the prior examination. His pulse was quick, and he was pale, as a man would be from being sick at the stomach. There was tenderness in the stomach. The vomiting might have been caused by indigestion, and also the paleness and quickening of the pulse, if it resulted in vomiting." Testimony was given showing that he appeared to have been out of health since that time, looked pale, and at times could not work.

The court overruled the motion for a nonsuit. The statement of plaintiff's intestate as to what occurred when he jumped off the train was corroborated in important particulars by the testimony of a lady, a Mrs. Aschew, who was riding in the caboose under a special permit. She said the conductor "spoke very decidedly about his getting off, and insisted on his getting off. The conductor told him

again that he must get off, and, before getting off, I heard the conductor say, while on the platform, 'You can get off.' The conductor seemed very decided about having the man get off. He was not rough and boisterous or insolent in manner, did not use bad language, and I do not remember that he put his hands upon the man or touched him. It appeared that the man seemed very reluctant about getting off when the train was moving, and the conductor seemed very firm about his getting off. I could not say how fast the train was moving, but not as fast as it moved later."

The conductor testified that Stone tendered him a dollar for fare, and told him to put it in his pocket and say nothing about it. That he told him that he could not do it, it was against the rules, and that he would have to get off the train. That he went towards the rear door of the caboose. Stone followed him out; stepped down on the steps of the rear platform. That he said to him: " Hold on; don't attempt to get off here until this helping engine lets go,"— to which he replied: " Well, I don't believe I can get off any way. You are going too fast." The conductor replied: " That is an old canard. Every person that gets on, that is their card. I don't ask you to get off. It don't take but a few minutes to stop the train, which I will do." That the helping engine let go, and he put one foot and his hand upon the railing to go upon top of the caboose; and Stone stepped off, and said that he would make it good and hot for the conductor for putting him off the train. " I didn't see him jump at all. He merely stepped off. He had hold of the front railing of the car when he stepped off."

Stone told the operator at the North Wisconsin Junction, ten or fifteen minutes after he had been put off, that he believed he would go to Hudson, where he had some friends, and see whether they had a right to put a man off

any place they were a mind to; that he thought he would bring a suit then. Defendant's counsel moved to strike out the testimony of the witness Dr. Wade in respect to his conclusions and opinion as to the condition of Stone on the day after the injury, in so far as it appeared from the evidence that the conclusions and opinion were based upon statements made to him by Stone, on the ground that he had it in his mind at the time he made the statements to bring a suit against the company to recover damages. The court denied the motion and said the jury could take that subject into consideration in weighing the doctor's testimony; that if the statements so obtained were made, not for the purpose of obtaining treatment, but getting information out of the doctor, they would consider that in weighing the doctor's opinion.

The circuit judge instructed the jury that if Stone was properly a passenger the conductor had no right to put him off; that if he was not he had such right; that another question they should consider was "whether the conductor used due and proper caution in putting the plaintiff off the train; that if they found that he did, and the plaintiff was not a passenger on the train, of course the conductor had a right to put him off, doing it in a proper way and using proper care; but if they found that the conductor did not use proper caution, but compelled plaintiff to get off against his will, while the train was in motion so it was dangerous for him to get off, and that as a result the accident occurred from which the plaintiff received injuries, it would be their duty to find for the plaintiff;" that "if they found that he was not a passenger, and was ordered off negligently, while the train was moving at a rate of speed making it dangerous to get off, and plaintiff was injured by such negligence of the conductor, in either of these cases they would find for the plaintiff." The law with regard to compensatory and punitory damages was stated to the

jury, and they were directed, if they found any punitory damages, to state the amount separately.

The jury found a verdict for $1,000 compensatory damages, and $500 punitory damages. On motion for a new trial, the verdict as to the punitory damages was set aside, and judgment entered in favor of the plaintiff for $1,000 compensatory damages, from which the defendant appealed.

*Solon L. Perrin*, for the appellant, contended, *inter alia*, that as the statements to Dr. Wade were made when plaintiff's mind was engrossed with the idea of recovering damages for his injuries, the same rule ought to apply that would apply if the action had been actually commenced. *Abbot v. Heath*, 84 Wis. 314; *Stewart v. Everts*, 76 id. 40; *Kreuziger v. C. & N. W. R. Co.* 73 id. 158; *Quaife v. C. & N. W. R. Co.* 48 id. 513; *Vosburg v. Putney*, 78 id. 84, 85; *Bennett v. State*, 57 id. 69, 81, 85; *Noonan v. State*, 55 id. 258.

For the respondent there was a brief by *Smith & Oakes*, and oral argument by *H. H. Smith*. To the point that the testimony of Dr. Wade was admissible, they cited Rogers, Exp. Test. (2d ed.), par. 47; *Quaife v. C. & N. W. R. Co.* 48 Wis. 525; *Barber v. Merriam*, 11 Allen, 322, 324.

PINNEY, J. 1. There was sufficient evidence to warrant the submission of the case to the jury, under the instructions of the court, to find whether the conductor put the plaintiff's intestate off the train in a proper way and using proper care; that if the conductor did not use proper caution, but compelled him to get off against his will, while the train was in motion so that it was dangerous for him to get off, and as a result he received injuries, it would be their duty to find for the plaintiff, whether he was a passenger or not. And the evidence was sufficient, in our opinion, to sustain the verdict of the jury against the defendant in this aspect of the case. The conductor was engaged at the time in the

transaction of the defendant's business, in the management and control of the freight train in question, and which did not carry passengers. He was acting within the scope of his authority at the time, as conductor of the train, so that the defendant company was plainly liable for any injuries sustained by the plaintiff's intestate by reason of any imprudent, reckless, or wanton conduct on the part of the conductor in compelling him to leave the train, or by putting him off while it was in motion and under circumstances which rendered it imprudent or dangerous to do so. *Holmes v. Wakefield*, 12 Allen, 580; *Rounds v. D., L. & W. R Co.* 64 N. Y. 129. If Stone had no right to be on the train, as a passenger or otherwise, he was not thereby put beyond the protection of the law, or subject to be removed or compelled to leave the train in an improper manner or under circumstances of such difficulty or peril as to endanger his personal safety. The charge of the court in this respect was clearly just and proper. Conductors, while intrusted with very considerable power and control over persons coming upon their trains, are bound to exercise their authority of removal in a reasonable and prudent manner, and with a proper regard to the safety of even those not lawfully on their trains as passengers.

2. When Dr. Wade was consulted by the plaintiff's intestate, the next morning after the occurrence in question, no action had then been instituted by him against the company for the injury of which he complained, though he probably entertained some intention of bringing suit. Dr. Wade had been treating him for gastritis, and he had shown decided improvement. It does not appear what statement Stone made to the doctor, nor that he sought any opinion of him in respect to any contemplated action against the defendant; nor is it made to appear but that his statements were made solely with a view of obtaining medical treatment. Dr. Wade testified in respect to the objective symptoms,— those he was able to discover by

observation and examination,— and although he says, in substance, that he could not distinguish between these symptoms and the subjective ones, learned by communication from the patient, in arriving at his conclusions, we think his evidence was competent and was properly admitted and that the court properly refused to strike it out. The statements or declarations of a patient, made to a physician or surgeon for the purpose of obtaining advice or treatment, descriptive of his pains and their location, his symptoms, and the manner in which he is affected by an injury, may be given in evidence to show the character and extent of his injury (*McKeigue v. Janesville*, 68 Wis. 57; *Quaife v. C. & N. W. R. Co.* 48 Wis. 513); but not when made to an expert, after action brought for an injury, in order to enable him to testify as a witness at the trial for the injured party (*Stewart v. Everts*, 76 Wis. 40, 42; *Abbot v. Heath*, 84 Wis. 317, 320). The rulings of the circuit court in respect to the evidence of Dr. Wade are fully sustained by the cases above cited.

3. The error, if any, in charging the jury that the plaintiff might recover punitory damages, was cured and obviated by the form of the verdict, by which the compensatory damages were stated at $1,000, and the punitory damages at $500; the verdict as to the punitory damages having been set aside on motion for a new trial. We do not think that there is any ground for saying that the charge of the court allowing the jury to find punitory damages had any tendency to increase the amount of the compensatory damages. As there were separate findings on the subject of damages, the presumption is that the compensatory damages were confined within proper limits.

This view of the case renders the consideration of all other errors assigned unnecessary. For these reasons, the judgment of the circuit court must be affirmed.

*By the Court.*— The judgment of the circuit court is affirmed.